## Case No. 8,153.

### LEA v. The ALEXANDER.

[2 Paine, 466.] [1]

Circuit Court. [2]

SALVAGE—SERVICE BY PILOTS — IN LINE OF DUTY AS PILOT—KIND OF SERVICE RENDERED— MEANS EMPLOYED BY SALVORS.

1. Salvage is an allowance for saving a ship or goods at sea, or both, from dangers, fire, pirates or enemies.

2. Whenever a vessel in the charge of her officers is exposed to imminent peril on the high seas, and is relieved therefrom by others, it presents a case for salvage, even though the service has been rendered by pilots; and to entitle to salvage, there need not have been risk of life, expenditure of money, or the application of any extraordinary means, but may be exclusively a case of skill.

[Cited in Flanders v. Tripp, Case No. 4,854.]

3. A shoal running out into the sea, which is not an entrance to a bay, inlet, river, harbor or port, though within the cruising ground, is not pilot's water, unless it has been made so by law. If a vessel has been run aground upon such shoal, and is in danger of shipwreck, and a pilot volunteers to extricate her from peril, and by getting her into deep water places her in safety, the service is not pilotage, and he is entitled to salvage.

[Cited in The Whistler. 13 Fed. 298.]

4. Pilots cannot be salvors for any service they may render in the performance of their ordinary duty. But they may become salvors when they render services not in the line of their duty, by which a vessel is relieved from danger, threatening shipwreck. They may be salvors even after the relation of pilot to a particular vessel has been begun; and the service, without regard to the place where it is rendered, will determine whether a pilot is or is not a salvor. They must, however, in all cases, before they can be salvors, go to the extreme point of their duty.

[Cited in The Cachemire, 38 Fed. 522.]

5. A pilot in a proper case will be entitled to salvage, notwithstanding the ordinance from which he derives his commission to act as pilot, makes it his duty to go to vessels in distress.

[Cited in The Susan, Case No. 13,630.]

[Appeal from the district court of the United States.

[Libel by William P. Lea against the ship Alexander and her cargo for salvage.]

John L. Wilson and George W. Cross, for appellants.

M. King, for appellees.

WAYNE, Circuit Justice. This is a case in which a valuable ship and cargo were, in all probability, saved from total loss, by the skill and knowledge of a branch pilot, who promptly went to her assistance when told of the ship's peril. There was no risk of

---

[1] [Reported by Elijah Paine, Jr., Esq.]
[2] [District and date not given. 2 Paine includes cases decided from 1827 to 1840.]

life, no expenditure of money, nor application of extraordinary means to effect it; and the time taken to render the service did not exceed four hours. It is exclusively a case of skill, combining good seamanship, in sailing the ship, with a knowledge of the shoals upon which she had been run aground, when in the charge of her captain. The case is purposely presented in such a light, that it may be viewed at the lowest point of merit. Does it present a case for salvage? I think it does. It is so upon the principle, that whenever a vessel has been run aground upon a shoal on the high seas, in the charge of her officers, and she is relieved from imminent peril by other persons, it presents a case for salvage, whether the service has been rendered by pilots or by other persons. The term "high seas" is used to distinguish cases occurring on them from such as happen in bays, inlets, rivers, harbors and ports. In the latter, the principle will be modified in its application, according to the circumstances of each case, and the laws under which pilots act. So, also, the principle will be varied in its application, when the congress of the United States shall exercise its constitutional power, by regulating the pilotage of vessels on the coast, within the distance to which a nation may extend its legislation over the sea—when it shall designate the locality of pilot's waters beyond the fauces terrae, and shall fix a compensation or salvage to be given to pilots for aiding vessels in danger of being wrecked on the coast. I have said when congress shall do this, because, by the act of the 7th August, 1789, it has only adopted the laws of the states, regulating pilots in the bays, inlets, rivers, harbors and ports of the United States; and congress alone has the power to regulate pilotage upon the coast out of the enumerated places, and beyond the jurisdiction of the states. This case was argued by the respondent's counsel, as if the ordinances of the city council of Charleston had regulated pilotage on the coast, out of the bays, inlets, rivers, harbors and ports in South Carolina. I then suggested a doubt as to the existence of such a power in the states, and would have urged an argument on the point more than I did, if I had not found, upon examination, that the ordinances of Charleston regulating pilotage had not gone beyond bays, inlets, rivers, harbors and ports. This view of the case disposes of the objection urged against the allowance of salvage to the libellant, because the service was rendered within his cruising ground. I understood the counsel making the objection, to use the term "cruising ground" as synonymous with "pilot's water" or "pilotage ground." They are not the same, however. By pilot's cruising ground, is meant that distance out in the sea along a certain extent of coast that pilots cruise for vessels bound to ports, inlets, harbors, rivers or bays into which a pilot may take them by his commis-

sion. By pilot's water or pilotage ground, is meant the access to a bay, inlet, river, harbor or port, beginning at the exterior point, where a pilot may take leave of an outward-bound vessel, and extending to the places fixed upon by law or usage for the anchorage or mooring of inward-bound vessels. A shoal running out into the sea, which is not an entrance to a bay, inlet, river, harbor or port, though within the cruising ground, is not pilot's water, unless it has been made so by law. If a vessel has been run aground upon such shoal, and is in danger of shipwreck, and a pilot volunteers his aid to extricate her from peril, by getting her again into deep water, and does place her in safety, the service is not pilotage in the proper acceptation of the term. It is a service rendered by a pilot, but one out of the line of strict legal obligation, and beyond his ordinary duties.

But it was urged, that the service rendered by the libellant was a case of ordinary pilotage. That if more than one of ordinary pilotage, it was one of that class of cases for which pilots have been allowed extraordinary pilotage compensation for extraordinary services, as contradistinguished from ordinary services, and not a case for salvage. It was also urged, that a pilot could not be a salvor in any case; and if the law was otherwise, that then the libellant could not be a salvor, as his services had been given to a vessel in distress, only as he was bound to give them by the ordinance from which he derived his commission to act as a pilot. What is salvage? It is an allowance for saving a ship or goods at sea, or both, from dangers, fire, pirates or enemies. Lord Chief Justice Abbott, in his treatise on Shipping, 397, defines salvage, "a compensation that is to be made to other persons by whose assistance a ship, or its loading, may be saved from impending peril or recovered after actual loss." Holt, in his System and Navigation Laws of Great Britain, says it is "a compensation for the safety of a ship or cargo, paid to those by whose labor and courage they have been preserved from wreck, or recovered after capture." Test this case by these definitions, without regard to the objection that a pilot cannot be a salvor, and it is clearly a case for salvage. Here was a ship making her first land fall, aground upon a shoal, between breakers, without sea-room to perform common nautical operations without danger of shipwreck, from which her officers and crew could not extricate her, but from which she was relieved by the skill and knowledge of others, and saved from inevitable shipwreck. It will not be contended that such services, rendered by one not a pilot, would not make him a salvor. Is the libellant excluded from being a salvor, because he was a pilot of the bar and harbor of Charleston? The objection that pilots cannot be salvors, has been repeatedly overruled in the courts of

this country, and in the admiralty courts in England. The contrary doctrine was early affirmed in Carolina, in the case of Dulany v. The Peragio [Case No. 4,123]. The language of that authority is, that pilots, like other persons, may entitle themselves to salvage, by performing services beyond the mere line of their duty. The law is, that a pilot cannot be a salvor for any service he may render in the performance of his ordinary duty. But in the case of The Joseph Howey, 1 C. Rob. Adm. 306, it is said, "In extraordinary cases the safe conduct of a ship under circumstances of extreme personal danger and personal exertion, may erect a pilotage service into something of a salvage service." Lord Alvanley, in the case of Newman v. Walters, 3 Bos. & Pul. 616, puts a case which shows it was his opinion, and that of Lord Stowell, that pilots may be salvors. He says: "Suppose a tempest should arise while the pilot is on board, and he should go off in a boat to the shore to fetch hands, and should risk his life for the safety of the ship in a manner different from that which his duty required; in such a case, it seems to me that he would be entitled to a compensation in the nature of salvage; and I am glad that Sir William Scott appears to entertain the same opinion." Mr. Justice Washington, in the case of Le Tigre [Case No. 8,281], after stating that ordinary official duties were not to be compensated by salvage, adds: "Of this class of cases is that of a pilot who safely conducts into port a vessel in distress at sea. He acts in the performance of his ordinary duty, imposed upon him by the law, and the nature of his employment, and he is therefore not entitled to salvage, unless in a case where he goes beyond the ordinary duties attached to his employment." In the case of The Elvira [Case No. 4,423], a dismasted vessel, Judge Hopkinson, of Pennsylvania, allowed salvage to pilots for towing into port, expressly overruling the objection that pilots could not be salvors for services rendered to vessels in distress, beyond their ordinary duties. The law then is, that pilots may become salvors when they render services not in the line of their duty, by which a vessel is relieved from danger, threatening shipwreck. They may be salvors, even after the relation of pilot to a particular vessel has been begun, and the service, without regard to the place where it is rendered, will determine whether a pilot is or is not a salvor. They must, in all cases, before they can be salvors, go to the extreme point of their duty; and the circumstances of the case in which they may claim to be considered as salvors, must obviously be such as require efforts, perils to be encountered, labor or skill out of the line of their duty, and the inferences drawn from them are sanctioned by the supreme court, in the case of Hobart v. Drogan [10 Pet. (35 U. S.) 108], decided at its last term.

But, further, let the objection against a pilot being a salvor be tested by Lord Stowell's definition of a salvor, given in the case of The Neptune, 1 Hagg. Adm. 236, 237, which was adopted by the supreme court in the case of Hobart v. Drogan. A salvor is "a person who, without any particular relation to a ship in distress, proffers useful services, and gives it as a volunteer adventurer, without any pre-existing covenant that connected him with the duty of employing himself for the preservation of that ship. The supreme court had said this rule is founded in public policy, and strikes at the root of those temptations which might otherwise exist to an alarming extent, to seduce pilots and others to abandon their proper duty, that they might profit by the distresses of the ship which they are bound to navigate." But the court did not consider the rule as excluding a pilot from being a salvor, on account of his covenant to aid vessels in distress, in a case where the pilot had no official connection with the ship before she was in imminent peril. By citing, too, Lord Alvanley's supposed case with approbation, the court affirms that pilots may be salvors in cases after a pilot's official connection with a ship has commenced. The relation which a pilot may ultimately bear to a vessel which he boards is not determined by the character in which he goes on board or in which he has been received, but by the services he may be called on by the exigence of the vessel to perform. The pilot's obligation to the public is to cruise off the port for which he is commissioned—to offer his services to vessels which he may suppose bound inwards—to a vessel in distress first, though she may be more distant than another—and in many cases of distress, his relation begins and ends with no more than the service of a pilot. Where the ship is in distress, being dismasted, sprung a leak, or from any other casualty, but can still be navigated with whatever may be her draft of water, it will be a case of ordinary pilotage. But if a vessel already upon a shoal, in danger of shipwreck, is boarded by a pilot, whose services are accepted to take her out of her peril, and he saves her from probable loss, his particular relation of pilot does not begin until the contingency of the vessel's shipwreck has passed, by her being again in deep water, as off the shoal; and then it will not occur unless the vessel is bound into the port for which the pilot is commissioned to act, or unless the injury she has sustained makes it necessary to carry her into such port. Suppose the Alexander had not been bound for Charleston, but had pursued her voyage to some other port, after she had been extricated from Roman Shoals by the libellant, what fee would he have been entitled to for his services, under the ordinances of Charleston? The ordinance does not provide for such a case. The libellant would not have been entitled to pilotage for taking her into port, for that would not have been done.

Would the offer of such a fee have been a lawful and adequate compensation for such a service? He being bound to Charleston can make no difference in the merit and character of those services which placed her in a condition out of imminent peril, to be piloted into her destined port. The original service, then, was neither a case of ordinary or extraordinary pilotage, but a service which saved a vessel from impending wreck; and it is this feature in the case which makes it one for salvage. The 14th section of the ordinance does not apply, by which the compensation in such a case can be measured; for that is a daily compensation of four dollars for every day a pilot is on board a vessel of which he takes charge ten leagues from land.

The remaining objection urged against salvage in this case is, that the ordinance from which the libellant derived his commission to act as pilot makes it his duty to go to vessels in distress; and being a duty, he cannot have salvage for performing it. It is a pilot's duty to go to vessels in distress, and for not doing so he may be mulcted in the penalty of the ordinance, and be deprived of his commission. But for such a service the ordinance fixes no compensation; nor can one be fixed which would be just in all cases, or which could impose upon a pilot the obligation to do more than a pilot's duty in bringing the vessel into port. The circumstances attending each case of distress must determine whether the service rendered by a pilot is one of ordinary or extraordinary pilotage, or a case for salvage.

In the consideration of this case I have carefully examined all the laws of England, France and Holland regulating the pilotage of vessels upon the coast, to ascertain the views of the legislators of those nations as to the character of services rendered by persons saving vessels from shipwreck upon the coast. I find them always considered as salvage services, only varying in the mode and tribunals by which the salvage is to be assessed. They are not authority to bind my judgment, but I hope they have aided to instruct it to a right conclusion in this case. I find them coinciding with the judgment of our own courts in such cases, and sustained by reasoning which deliberate examination and thought convince me is correct.

Upon the whole, then, my conviction is that the ship Alexander would have been shipwrecked upon the shoal upon which she was aground, if she had not been extricated by the timely arrival and skill of the libellant. I think the service makes the libellant a salvor, and the ship being at least of the value of fifteen thousand dollars, one thousand dollars is decreed to the libellant as salvage, exclusive of his pilotage fees for carrying the vessel into port, and costs. The judgment of the court below is reversed, and the cross appeal of the respondent is ordered to be dismissed.

NOTE. In the case of The Emulous [Case No. 4,480], Judge Story said:—"I take it to be very clear, that wherever the service has been rendered in saving property on the sea, or wrecked on the coast of the sea, the service is, in the sense of the maritime law, a salvage service. If it has been rendered under circumstances which establish that the parties have voluntarily and without any controlling necessity on the side of the proprietors of the property saved, or their agents, entered into a contract for a fixed compensation, or upon the ordinary terms of a compensation for labor and services quantum meruerunt; in either case, it does not alter the nature of the service, as a salvage service, but only fixes the rule by which the court is to be governed in awarding the compensation. It is still a salvage contract, and a salvage compensation. It is true that contracts made for salvage services are not ordinarily held obligatory by the court of admiralty upon the persons whose property is saved, unless the court can clearly see that no advantage is taken of the parties' situation, and that the rate of compensation is just and reasonable. The doctrine is founded upon principles of sound public policy, as well as upon just views of moral obligation. No system of jurisprudence purporting to be founded upon moral, or religious, or even rational principles, could tolerate for a moment the doctrine that a salvor might avail himself of the calamities of others to force upon them a contract unjust, oppressive and exorbitant; that he might turn the price of safety into the price of ruin: that he might turn an act demanded by Christian and public duty, into a traffic of profit which would outrage human feelings, and disgrace human justice." In the case of Clarke v. The Dodge Healy [Id. 2,849]. Washington, J., said:—"It may confidently be laid down, as an undisputed principle upon which a claim for salvage at all times rests, that unless the property be in fact saved by those who claim the compensation, it cannot be allowed, be their intention however benevolent, and their conduct however heroic. If Providence kindly aids their exertions, by which the object is attained, so much the better for them; nor would that circumstance deprive them of merit, although it might diminish the rate of compensation; but exertions must be made, and the probability that they contributed, or might contribute to save the property, should appear by some proof, although, from circumstances, slight proof only could be expected. I will not say that where the danger is proved, and the vessel is conducted by the asserted salvors into a place of safety, every presumption, in the necessary absence of other evidence, may not be made in their favor. But where it is proved by other evidence, as it is in this case, that no human force could have averted the danger unless a particular act was done, which act the same evidence shows was nearly impossible to have been accomplished, the court cannot say that the vessel was saved by the exertions of these libellants. The general principle before stated is too firmly established by authorities to admit of controversy. 'Salvage,' says the court in the case of The Amelia, 1 Cranch [5 U. S.] 1, 'is a compensation for actual services rendered to the property charged with it.' And in the case of The Alerta, 9 Cranch [13 U. S.] 367, it is said, 'Salvage is allowed as a reward for the meritorious conduct of the salvor, and in consideration of a benefit conferred on the person whose property he has saved.' It is also stated in the first of these cases, that not only must the service rendered be meritorious, but the possession taken of the thing saved must be lawful."